IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| Cordarius O. Gray, | ) | Civil Action No. 7:15-cv-4133 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **OPINION AND ORDER** |
| | ) | |
| | ) | |
| BMW Manufacturing Co. LLC, | ) | |
| Management Analysis & Utilization Inc. | ) | |
| *d/b/a* MAU Workforce Solutions Inc. | ) | |
| *d/b/a* Tier One Solutions, | ) | |
| | ) | |
| Defendants. | ) | |

This action arises out of Plaintiff Cordarious O. Gray's ("Plaintiff" or "Gray") termination with Defendants Management Analysis & Utilization Inc. ("MAU") and BMW Manufacturing Co. LLC ("BMW") (collectively "Defendants"). On October 6, 2015, Plaintiff filed this action pursuant to the Americans with Disabilities Act ("ADA"). In accordance with 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02(B)(2)(g), D.S.C., this matter was referred to United States Magistrate Judge Jacquelyn D. Austin for consideration. On December 15, 2016, BMW and MAU each filed a motion for summary judgment (ECF Nos. 34 & 35). Plaintiff responded on December 29, 2016 (ECF No. 36), and BMW and MAU each filed a reply on January 5, 2017 (ECF Nos. 38 & 39). The Magistrate Judge prepared a thorough Report and Recommendation ("Report"), which recommends that BMW's motion for summary judgment be granted and that MAU's motion for summary judgment be granted with respect to Plaintiff's discrimination and retaliation claims and denied with respect to Plaintiff's failure to accommodate claim. (ECF No. 42.) MAU filed

1

timely objections (ECF No. 43), to which Plaintiff replied (ECF No. 47). Plaintiff filed timely objections (ECF No. 44), to which BMW and MAU replied (ECF Nos. 45 & 48). After careful consideration of the record, the briefing, and the relevant law, and for the reasons set forth herein, the Court adopts the Report, grants summary judgment as to BMW, grants summary judgment as to MAU with respect to the discrimination and retaliation claims, and denies summary judgment as to MAU with respect to the failure to accommodate claim.

## BACKGROUND AND PROCEDURAL HISTORY

The Report sets forth in detail the relevant facts and standards of law and the Court incorporates them and summarizes below only in relevant part. In his complaint Gray alleges causes of action for (1) termination of his employment because of a disability (discrimination claim), (2) denial of reasonable accommodation for said disability (failure to accommodate claim), and (3) retaliation for engaging in protected activity (retaliation claim) under the ADA. Gray was an employee of MAU assigned to work as a production associate at the BMW manufacturing plant in Greer, South Carolina.[1] BMW concedes that it is Gray's "employer" for purposes of the ADA, pursuant to a joint employment relationship between MAU and BMW.

MAU maintains an employee handbook that applies to associates assigned to work at BMW. Gray received a copy of this handbook when he began working for MAU. The handbook contains MAU's alcohol and substance abuse policy. The policy states that any employee will be drug tested "after any accident." The policy further provides: "If an associate tests positive in the initial on-site test, he/she will immediately be

---

[1] BMW has a contractual relationship with MAU, under which MAU provides personnel services to BMW. (ECF No. 42 at 2 n.1.)

suspended until verification of the test results by an off-site laboratory. If the Medical Review Officer confirms a positive test by the off-site laboratory, then the associate's employment will be terminated." (ECF No. 35-8 at 13.)

As part of the new-hire process in November 2012, Gray submitted to a pre-employment drug screen, and completed a consent form on which he indicated he was taking 20 mg of Adderall. The results of the pre-employment drug screen, however, were negative. Gray never made further disclosure of his Adderall use than this pre-employment consent form. Throughout his employment with MAU at the BMW plant, Gray took Adderall every day that he worked.

On January 22, 2013, Gray was using a forklift to stack a container on top of another container. While performing this task, Gray hit and damaged a wall mounted control panel with a container, and was required to submit to a drug test in accordance with the policy. The initial onsite drug screen was negative. Gray reported as directed for a laboratory drug screen on January 24, 2013, and again indicated 20 mg of Adderall on the consent form. On January 29, 2013, Gray's hair sample drug screen came back negative. On February 3, 2013, Gray's urine drug screen came back positive for amphetamines.

MAU contracted with Spartanburg Regional Occupational Health ("SROH") to perform its drug testing confirmation processes. A representative of SROH, LaShaunna Brannon ("Brannon"), was supposed to follow up with Gray to request proof of a valid prescription for Adderall. Brannon states that she called Gray at the phone number listed on the consent form on four consecutive days and, receiving no answer, left messages

each time requesting Gray to call back. Gray states that he never received any calls from Brannon, and that voicemail service was not even set up on the phone number in question. Gray never provided a prescription for Adderall to SROH.

Next, Brannon forwarded Gray's positive test result to Dr. Michael Alday ("Alday"), the Medical Review Officer ("MRO"), for review and certification. Brannon informed Alday that she had contacted Gray on four consecutive days and left messages, but had received no response. On February 8, 2013, Alday signed the results of Gray's urinalysis screen, certifying a positive result for amphetamines.

SROH forwarded the certified positive drug screen to MAU on February 8, 2013. On February 11, 2013, MAU supervisors, including Jody Devore ("Devore"), Ronnie Rice ("Rice"), and Dwayne Oakley ("Oakley"), discussed the positive result in an email chain. (Ex. 3, Rice Dep., ECF No. 36-4 at 9-10.) Devore forwarded the email to Kim Hoffman ("Hoffman"), a nurse with an occupational health background, and asked the following question:

> Kim,
> Do we need to have the Doctor take a second look at this. [sic]
> The individual stated that they are on Aderal [sic] which may possibly show up as Amphetamines.
> Coradrius may just need to bring in his script for the medication.
> Please advise.

(*Id.* at 9.) Oakley, who was copied on the forward to Hoffman, responded: "The MRO actually makes contact with any employees [sic] that has a positive screening to discuss medications that they are taken [sic] before signing off on the screening." (*Id.*)

Rice, who was Gray's direct supervisor at MAU, made the decision to terminate Gray on February 13, 2013. Devore approved the termination decision on February 14,

2013. On February 15, 2013, after Gray had worked almost a full day, Rice met with Gray and another unidentified MAU supervisor, and informed Gray that his position with MAU was terminated based on the positive drug test result ("termination meeting"). During the meeting, Gray offered to provide proof of a prescription for Adderall, and stated that he was taking the medication due to a diagnosis of ADD. Rice told Gray that because he had failed to respond to calls from the testing site or to provide a valid prescription, the test results had been certified as positive.

After the termination meeting, Gray contacted MAU about submitting proof of a prescription for Adderall. He spoke with an unidentified employee at MAU, who instructed him to call the drug testing center. However, when Gray called the testing center, he was told that MAU would have to give the testing center permission to accept his submission of a prescription.

On June 13, 2013, Gray filed charges of discrimination with the EEOC alleging that MAU and BMW had discriminated against and retaliated against him on the basis of a disability. The EEOC issued a notice of right to sue on July 8, 2015, and this lawsuit was filed on October 6, 2015.

BMW and MAU seek summary judgment on all causes of action. In general, they argue that Gray's termination was the routine result of a certified positive drug test, conducted in accordance with MAU's alcohol and substance abuse policy. According to Defendants, Gray was provided with multiple opportunities to substantiate his lawful Adderall use by providing a valid prescription and never did so. Thus, Defendants argue, MAU was justified in terminating Gray, and the Court should not second guess its

business judgment. Gray opposes summary judgment, arguing generally that Defendants knew he was taking Adderall, and knew that he had a prescription, but decided to fire him anyway. Gray asserts that his ADD was the real reason for his termination, and that Defendants failed to make reasonable accommodation for this disability when he asked to produce a valid prescription during the termination meeting so that he could keep taking Adderall while working for Defendants. In addition, Gray argues that his termination was ultimately in retaliation for him making this accommodation request.

The Court has thoroughly reviewed the objections to the Report and the relevant case law. Additionally, the parties appeared before the Court for oral argument on their objections on July 26, 2017. (ECF No. 51.) After due consideration, the Court finds that the law entirely supports the Magistrate Judge's conclusions and recommendations; thus, the Court will overrule the parties' objections and enter judgment accordingly.[2]

## STANDARD OF REVIEW

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight. The responsibility for making a final determination remains with this Court. *Mathews v. Weber*, 423 U.S. 261, 270 (1976). The Court is charged with making a *de novo* determination of any portions of the Report and Recommendation to which a specific objection is made. The Court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions. *See* 28 U.S.C. §

---

[2] As always, the Court says only what is necessary to address the parties' objections against the already meaningful backdrop of a thorough Report of the Magistrate Judge; comprehensive recitation of law and fact exists there.

636(b)(1). The Court need not conduct a *de novo* review when a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982). In the absence of a timely filed, specific objection, the Magistrate Judge's conclusions are reviewed only for clear error. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005).

## DISCUSSION

**MAU's Objections**

MAU objects to the Report, arguing the Magistrate Judge erred in finding that questions of fact remain with regard to whether MAU denied Plaintiff a reasonable accommodation. (ECF No. 43 at 1.) In order to establish a *prima facie* case of failure to accommodate, Plaintiff must show: (1) he is an individual who has a disability within the meaning of the ADA; (2) his employer knew of the disability; (3) with reasonable accommodations, he was otherwise qualified to perform the essential functions of the job; and (4) his employer refused to make such reasonable accommodations. *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013). Specifically, MAU argues that the Magistrate Judge erred in finding that there is a question of fact with regard to (1) whether Plaintiff has a disability within the meaning of the ADA, (2) whether MAU had notice of the alleged disability, and (3) whether MAU refused to provide a reasonable accommodation. (ECF No. 43 at 2.)

MAU first asserts that Gray's affidavit should not have been considered by the Magistrate Judge in her analysis of whether Gray is disabled within the meaning of the

ADA, because the affidavit conflicts with Gray's deposition testimony that the only symptom of his ADD was "lack of focus," and Gray should not be permitted to manufacture an issue of fact by submitting an affidavit that contradicts prior deposition testimony. (*Id.* at 2-5.) The Magistrate Judge specifically addressed MAU's contention that the affidavit is inadmissible in her Report:

> MAU argues that Plaintiff's affidavit is inadmissible and should be disregarded because it contradicts his prior deposition testimony. [Doc. 39 at 14-15.] The Fourth Circuit Court of Appeals has held,
>
>> "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of plaintiff's testimony is correct.
>
> *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) (internal citations omitted). However, here, Plaintiff's affidavit does not contrast starkly with his deposition testimony. Instead, Plaintiff's affidavit explains in more detail the symptoms caused by his ADD. Plaintiff testified in his deposition that lack of focus was the only symptom caused by his ADD and that he took Adderall to stay on task and stay focused [Doc. 35-2 at 8-9], and his affidavit simply describes in more detail his inability to focus and the results of his inability to focus when he is not taking Adderall [Doc. 36-2]. Accordingly, the Court considers Plaintiff's affidavit with respect to the symptoms caused by his ADD.

(ECF No. 42 at 17 n.1.) The undersigned agrees with the Magistrate Judge that Gray's affidavit expounds upon the symptoms of his ADD, rather than conflicting with his deposition testimony. MAU's arguments are unpersuasive to show that the affidavit impermissibly manufactures a question of material fact regarding Gray's alleged disability. Accordingly, the Court finds that the Magistrate Judge properly considered

Gray's affidavit in analyzing the failure to accommodate claim.

In his deposition, Gray was asked what "symptoms" he generally experienced as a result of his ADD, to which question Gray responded simply: "Lack of focus." (Gray Dep. 32:24-33:2, ECF No. 36-1.) Gray was then asked if there was "[a]nything else," to which he responded: "No, sir." (*Id.* at 33:3-4.) It should be noted that Gray was not asked any questions about the impact of his struggle with "lack of focus" upon his vocational life or any other major life activities. It is one thing to be asked to provide a list of symptoms; it is another thing to be asked to explain the effect of those symptoms.

In his affidavit, Gray expounds upon the effect of his difficulty focusing on certain tasks over the course of his lifetime, to include "extreme difficulty concentrating for extended periods of time," "difficulty listening to and understanding what was being taught" in school, having a "very hard time working effectively" and being "unable to focus on [his] work" when unmedicated. (Gray Aff. ¶¶ 2-11, ECF No. 36-2.) Nothing about this elaboration upon the impact of Gray's ADD on his ability to "focus" or "concentrate" is contradictory with his deposition testimony. Therefore, Gray's affidavit was properly included in the analysis of whether a genuine issue of material fact remains regarding Gray's putative disability under the ADA. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 n.7 (4th Cir. 2001) (stating that the exclusion of affidavit evidence on the ground that it is inconsistent with deposition testimony only applies where there exists a "bona fide inconsistency" between the two).

MAU next contends that the Magistrate Judge erred in finding that MAU had notice of Gray's alleged disability, thus satisfying the second element of a *prima facie*

case for failure to accommodate. The Magistrate Judge found that Gray's statements to Rice during the termination meeting that he took Adderall for ADD, and Gray's contemporaneous offer to show proof of a valid prescription for Adderall, provide a sufficient basis for a reasonable jury to conclude that Gray requested an accommodation of MAU during the termination meeting. (ECF No. 42 at 18-19.) The premise underlying this conclusion is that Gray was requesting an accommodation for a *disability*, and that Gray's remarks during the termination meeting were sufficient to put MAU on notice of the disability at that time. MAU contends, however, that Gray's simple assertions about his ADD and associated medication were insufficient to notify MAU that Gray's ADD substantially limited a major life activity. (ECF No. 43 at 5.) MAU points to the fact that Gray had been working at MAU for several months without ever requesting an accommodation, and suggests that there is no evidence of Gray needing an accommodation to perform his job as a production associate. (*Id.* at 6.)

This objection exhibits a needlessly technical approach to the concept of what it means for an employee to put an employer on notice of a disability. Certainly, Gray did not use the relevant terms of art in the termination meeting. However, he did not need to. Rather, the Court believes that Gray reacted to Rice's communication of the termination decision in the rational way one might expect of an employee who is hearing for the first time that he is being fired for taking a validly prescribed medicine that he faithfully disclosed on a consent form: by offering to produce the prescription.[3] In this context, the Court agrees with the Magistrate Judge that a reasonable jury could find that Gray's

_____

[3] It is little wonder that Gray did not deem it necessary to make any explicit requests regarding his continuing need to take Adderall prior to the termination meeting, as he had disclosed his Adderall use in the pre-employment drug screening process in November 2012 and had received no notice of an adverse result, nor been required to produce a prescription justifying his use of the medicine.

comments were sufficient to put MAU on notice of his alleged disability.

MAU's third objection has two prongs. MAU asserts that the Magistrate Judge erred in finding that a reasonable jury could conclude that Gray's "post-termination" request to submit a prescription was a valid request for a reasonable accommodation, because: (1) MAU's policy does not require modification, as it already contains built-in procedures and protocols designed to afford employees an opportunity to submit a prescription in connection with a positive drug test; and (2) to the extent Gray's request was a request for an accommodation it was untimely because it was made after his termination. (ECF No. 43 at 6-9.)

With regard to the first prong, MAU argues that under its existing post-accident drug testing policy, the MRO contacts employees who test positive for certain drugs in order to determine if they have a lawful prescription that would explain the positive result. MAU asserts that this policy was satisfied when Brannon attempted to contact Gray on four separate occasions to determine if he had a valid prescription for Adderall. In short, MAU contends that its policy contains a built-in accommodation for individuals who, like Gray, need to explain a positive test result through the provision of a prescription. MAU further argues that it is "undisputed that the aforementioned process was followed in this case." (ECF No. 43 at 7.)

In making these assertions, MAU relies upon a handwritten form, completed by Ms. Brannon, documenting her efforts to reach Gray by phone, including notations that she "left [a] msg" on each of four occasions. (ECF No. 35-24.) However, Gray testified that he did not receive any missed calls and his phone was not set up to receive

messages. (Gray Dep. 58:7-9, 65:23-66:3, 74:10-12, ECF No. 36-1.) Whatever the state of the evidence is with regard to whether MAU adequately followed its own procedure in permitting Gray an opportunity to validate his lawful use of Adderall, it can hardly be characterized as "undisputed." To accept Ms. Brannon's handwritten form as definitive on the point, Gray's testimony notwithstanding, would be to construe the facts in a light favorable to the moving party, a course antithetical to the Court's responsibilities at the summary judgment phase.

Moreover, to summarily conclude that the "process was followed in this case" would be to elevate form over substance. Brannon testified that in situations where she was unable to reach an employee when attempting to retrieve prescription information she would typically contact the relevant representative of the employer in question, here Michelle Somers ("Somers"),[4] and ask that representative to facilitate contact with the employee. (Brannon Dep. 30:21-35:24, ECF No. 36-14.) Brannon could not recall whether she spoke with Somers about her inability to reach Gray. (*Id.* at 31:24-33:1.) When Brannon did speak with Somers about a particular MAU employee, the expectation was that Somers would give the employee Brannon's contact information, so that the employee could submit prescription information. (*Id.* at 34:17-20.) Sometimes the employee in question would bring his or her prescription directly to Somers onsite at BMW, who would forward the documentation to Brannon to save the employee a trip to SROH. (*Id.* at 35:18-24.) There is no evidence of record to show that Somers contacted Gray at Brannon's behest, or informed Gray of his need to submit prescription

---

[4] Ms. Somers was a contract medical technician located at the BMW manufacturing facility in the Industrial Health Services Department ("IHS"). During the timeframe at issue in this case, IHS was operated by Take Care Health (Walker Dep. 7:20-8:11, ECF No. 34-4), a company with which BMW contracted to handle all occupational health functions at the facility.

information, neither is there any explanation as to why this typical safeguard was not employed. Furthermore, Devore and Rice testified that they regularly contacted employees to obtain proof of prescriptions themselves, whether in-person at the work facility or via written notification if the employee was out on medical leave. (Devore Dep. 15:22-16:10, 17:21-18:1, 27:20-28:4, ECF No. 36-12; Rice Dep. 21:12-22:1, ECF No. 36-4.) But there is no evidence that either supervisor informed Gray of his need to provide a prescription to substantiate his valid use of Adderall.

Speculation about the cause of this communication breakdown has no specific utility to resolving MAU's objections, but it is worth mentioning that the likely reason why none of the onsite staff (Somers, Devore, Rice) communicated with Gray about providing a prescription, though he continued showing up to work until the day he was fired, is that both the initial onsite drug screen and hair sample test came back negative. It would appear that no one at MAU knew that the urinalysis was positive for amphetamines until SROH forwarded a certified positive result on February 8, 2013. In the February 11, 2013 email chain among MAU supervisors, Devore suggests that "[Gray] may just need to bring in his script for the medication." (Ex. 3, Rice Dep., ECF No. 36-4 at 9.) But Oakley responds that the MRO would have already investigated this possibility "before signing off on the screening." (*Id.*) Oakley's comments could certainly have had the effect of chilling any follow-up efforts by Devore and Rice prior to carrying out the termination, however unwitting that chilling effect might have been. In this context, MAU's assertion that it is "undisputed that the . . . process was followed in this case" seems unjustifiably self-congratulatory. The Court agrees with the Magistrate Judge that "Plaintiff's request

to show proof of a prescription for Adderall could . . . be viewed as a request to extend the time during which he could provide proof of a prescription" and that "a reasonable jury could find that Plaintiff requested an accommodation" when he asked to be allowed to provide such proof. (ECF No. 42 at 18-19.) Accordingly, this prong of MAU's third objection is overruled.

The second prong of MAU's objection to the Magistrate Judge's conclusion regarding Gray's request for an accommodation is MAU's contention that the request was untimely because Gray had already been terminated at the time he asked to show proof of his prescription. Here, MAU relies upon the Fourth Circuit's holding in *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454 (4th Cir. 2012), for the proposition that a "post-termination" request for accommodation is untimely and need not be considered.

In *Halpern*, the Fourth Circuit held that a medical student's request for an accommodation was untimely where the student had engaged in various forms of misconduct prior to his dismissal from medical school:

> By the time Halpern requested that the Medical School implement his special remediation plan [for his ADHD], he had already engaged in numerous unprofessional acts that warranted his dismissal, including acting abusively towards staff, multiple unexcused absences, repeated failure to meet deadlines, and tardiness. Thus, Halpern sought not a disability accommodation, but "a second chance to better control [his] treatable medical condition." *Hill v. Kan. City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999). This, however, "is not a cause of action under the ADA." *Id.* A school, if informed that a student has a disability with behavioral manifestations, may be obligated to make accommodations to help the student avoid engaging in misconduct. But, the law does not require the school to ignore misconduct that has occurred because the student subsequently asserts it was the result of a disability. Halpern's argument that he was owed an opportunity to continue at the Medical School and correct his misbehavior is, therefore, without merit.

14

*Halpern*, 669 F.3d at 465. The facts in *Halpern* are readily distinguishable from those at issue here. Mr. Halpern was dismissed from medical school for *misconduct*, and only after repeated wrangling, *over a course of years*, with the school administration regarding his medical needs and behavioral issues. *See id.* at 457-60 (detailing Halpern's poor performance and misconduct, mitigation efforts made by the medical school, and disciplinary proceedings leading to his dismissal). Here, there is ample evidence that Gray had a valid prescription, no evidence that he engaged in misconduct, and no evidence that his use of Adderall had any adverse effects on his work performance. Viewed in the light most favorable to Gray, the facts suggest that he only received actual notice of the requirement to provide his prescription information *during* the termination meeting itself. Given these circumstances, the Court agrees with the Magistrate Judge, and finds that a reasonable jury could conclude that MAU refused to provide a reasonable accommodation timely requested by Gray. *See Kemp v. JHM Enterprises, Inc.*, No. 6:14-cv-02604-TMC-KFM, 2016 WL 859361, at *5 (D.S.C. Mar. 7, 2016) (refusing to extend the holding of *Halpern* and denying summary judgment on accommodation claim where employee requested accommodation during his termination meeting based on conclusion that the employee "arguably did not have sufficient time or opportunity to request an accommodation" prior to such meeting).

Finally, MAU asserts that the Magistrate Judge erred in finding that Gray's request obligated MAU to engage in an interactive process. (ECF No. 43 at 9-10.) MAU reasons that before it made the decision to terminate Gray, it had already engaged him in an interactive process through the MRO, via Brannon's attempts to reach Gray by

phone. (*Id.* at 10.) Thus, argues MAU, the Magistrate Judge's finding ignores the interactive process that is built into MAU's drug testing policy and procedures—a process automatically triggered by certain positive results potentially caused by lawful medication—and requires MAU to engage Gray in a *second* interactive process. (*Id.*)

This objection is too clever by half and ignores an issue of material fact previously explained by the Court. First, a given process can hardly be described as "interactive" in the absence of any contact between the relevant parties. Next, Brannon asserts that she made the required phone calls and left messages for Gray, while Gray states that he received no messages and was unaware of any missed calls. In addition, Brannon testified that, as a matter of course, she would follow up with the relevant employer representative, here Ms. Somers, whenever she was unable to contact an employee in the prescription verification process, and that Somers "always" got back to her once Somers reached the employee. (Brannon Dep. 31:2-23, 35:11-36:3, ECF No. 36-14.) But there is no evidence that Sommers reached out to Gray, and the facts construed in the light most favorable to Plaintiff dictate that he was not aware of the need to produce his prescription until the termination meeting. For these reasons, the Court agrees with the sound reasoning of the Magistrate Judge on these points. (*See* ECF No. 42 at 19-20.) The objection is therefore overruled.

**Plaintiff's Objections**

Plaintiff first objects to the Report on grounds that the Magistrate Judge erred in concluding that BMW is entitled to summary judgment on all claims. In this respect, the Magistrate Judge found that Plaintiff has failed to establish any involvement by BMW in

the decision to terminate Plaintiff or in the alleged failure to accommodate. (*Id.* at 7.) Noting that BMW has conceded its status as Plaintiff's "employer" within the meaning of the ADA, due to its joint employment relationship with MAU, the Magistrate Judge nonetheless concluded, "nothing in the record supports a finding that BMW had any involvement in the situation after it reported the forklift accident to MAU." (*Id.* at 8 (citing *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 228 (5th Cir. 2015) ("[E]stablishing a 'joint employer' relationship does not create liability in the co-employer for actions taken by the other employer." (internal quotation marks omitted))).)

Plaintiff objects to the Magistrate Judge's conclusion regarding BMW for two reasons: (1) BMW's argument that it was not involved in the employment decisions at issue was made for the first time in a reply memorandum and is therefore waived; and (2) the conclusion is incorrect on the merits because BMW is responsible for the acts and omissions of its agents. (ECF No. 44 at 3.) Plaintiff's waiver argument needs little discussion. In the statement of undisputed facts incorporated in BMW's summary judgment memorandum, BMW asserts that *MAU* made the termination decision and that "BMW Manufacturing played no role in the decision to terminate Plaintiff's employment. Rice would have notified BMW Manufacturing of Plaintiff's termination only after the decision was made." (BMW Mem. n.5, ECF No. 34-1 at 6 (internal citations omitted).) In making these assertions, BMW relies on the following testimony by Rice:

Q. Did you consult with anybody at BMW about [terminating Gray]?

A. We would inform BMW of the outcome, but not prior to.

Q. So by the time you consulted BMW, the decision had been made?

A. Right.

(Rice Dep. 24:2-7, ECF No. 34-9.) Moreover, in the analysis section of the memorandum, BMW repeatedly states, in various ways, that *MAU* made the decision to terminate Gray, and that *MAU* relied on the certified test result from Dr. Alday in making that decision. (*See* ECF No. 34-1 at 14, 16, 20, 26.) The Court finds that these assertions by BMW sufficiently communicated BMW's position that it was denying any responsibility for Plaintiff's termination, and the argument was not waived. In any event, Plaintiff, through his objections, has now had ample opportunity to respond to BMW's position, and specifically to the case law that he complains BMW cited for the first time in its reply brief.

Turning to the merits of whether BMW is responsible for the decisions of its "agents" in this context, the Court finds that there is no genuine dispute of material fact regarding BMW's involvement in the decision to terminate Plaintiff—it had none. Plaintiff makes a creative set of arguments that the "common thread among the . . . cases relied on by the Magistrate Judge is the application of ordinary agency principles," and "at least four agents of BMW had direct involvement in the series of decisions that led to Gray's termination, and BMW's Occupational Health Manager supervised the entire drug testing system." (ECF No. 44 at 6-8.) In particular, Plaintiff seizes upon the principle from *Burton*, *Whitaker v. Milwaukee Cty.*, 772 F.3d 802 (7th Cir. 2014), and *Williams v. Grimes Aero. Co.*, 988 F. Supp. 925 (D.S.C. 1997), that joint employers can share liability for discrimination when the plaintiff demonstrates that each defendant "knew or should have known of the discriminatory conduct and . . . *failed to take those corrective measures within its control.*" *Williams*, 988 F. Supp. at 937 (citations and quotations

omitted; emphasis added). But creative argument cannot change the facts of the case, and the factual record reveals *no evidence* that BMW had *any* involvement in the process of Gray's termination from the point where it notified MAU of the forklift accident that triggered the mandatory drug tests.[5]

During oral argument on the objections, Plaintiff's counsel conceded that there is no authority to support the application of respondeat superior principles in the joint employment context and condensed Plaintiff's agency theory into the following reasoning: because BMW "retains control" over the drug testing process at all times, it "owns the actions" of the individuals involved anywhere throughout. This reasoning is fleshed out in Plaintiff's written objections, wherein Plaintiff lists various persons that played a part in Gray's drug testing—Angela Ballard (administrated Gray's drug test, Take Care Health employee), Dr. Alday (MRO, SROH employee), Michelle Somers (medical technician, Take Care Health employee), LaShaunna Brannon (drug screen coordinator, SROH employee)—and avers that because they were part of a process generally directed by BMW's IHS Department, albeit through contractors, BMW is answerable for their acts and omissions. (*See id.* at 9-11.) Specifically, Plaintiff argues that BMW should be held accountable for the putative failure by these individuals "to take corrective measures within their control" in the course of Gray's drug testing. Plaintiff further notes that BMW (1) established the protocol administered by MAU Human Resources in connection with positive drug test results, (2) paid for the drug testing of

---

[5] BMW's notification to MAU consisted of an email from Glenn Tollison, Section Leader – Logistics, stating: "Tuesday evening Cordarius was moving a container inside from the 2.7 ramp and hit the operator panel for the hydrogen fueling station. Only the bulb covers for the indicator lights were broken. Security was called and a report was done. There was no one from MAU ARhere [sic] to report this to. I have included a picture of the panel." (Ex. 1, McWilliams Dep., ECF No. 36-5 at 4.)

MAU employees, (3) reserved the right to view drug test results of MAU employees, and (4) was made aware of all drug test results through its Manager of Occupational Health, Drew Walker. (*Id.*)

These "agency" arguments, while creative, are attenuated from the material questions in the case, and end up missing the point: the *only* individuals that can rationally be alleged to have *discriminated* against, *retaliated* against, or *failed to accommodate* Gray are *all* MAU employees. None of the individuals listed by Plaintiff played any role in the termination decision. Indeed, Rice's undisputed testimony reveals that BMW had no knowledge of MAU's decision to terminate Gray until after it was already done. (*See* Rice Dep. 24:2-7, ECF No. 34-9.) Plaintiff's claim that Mr. Walker, a BMW manager, "supervised the entire drug testing system" (*see* ECF No. 44 at 6) is particularly curious, given Walker's deposition testimony:

Q. So you, essentially, are the supervisor of that group, that IHS group?

A. Supervisor in which function?

Q. Do they report to you?

A. *No.* Well, they get their general oversight, but *I am not their supervisor*, per se. I don't administer their time. *They report to their organization.* I simply provide them direction to support BMW.

(Walker Dep. 6:20-7:3, ECF No. 34-4 (emphasis added).) There is simply no evidence that anyone at BMW "knew or should have known of . . . *discriminatory* conduct." *See Williams*, 988 F. Supp. at 937 (listing such knowledge as a prerequisite of liability in the joint employment context). Neither is there any evidence that the corrective measures which might have remedied the inchoate process of Gray submitting his prescription

information—e.g., Ms. Brannon making further efforts to contact Gray by enlisting the assistance of Ms. Somers—were within BMW's control in any meaningful sense. The Court declines to read *Burton*, *Whitaker*, and *Williams* as sanctioning "guilt by association" for discrimination in the joint employment context. Accordingly, Plaintiff's objection is overruled and summary judgment is granted as to BMW with respect to all claims.

Plaintiff next objects that the Magistrate Judge erred in concluding, as a matter of law, that the explanation for Gray's termination was non-pretextual. (ECF No. 44 at 11-17.) In her Report, the Magistrate Judge first acknowledged that "[a] deviation from normal business practices can illustrate pretext." *Palomino v. Concord Hosp. Enters. Co.*, 126 F.Supp.3d 647, 655 (D.S.C. 2015) (citing *Vaughan v. Metrahealth Companies, Inc.*, 145 F.3d 197, 201 (4th Cir. 1998)). However, where there is no evidence that the employer was motivated by a discriminatory animus, deviation from normal business practices creates no presumption of discrimination. *Stiles v. Gen. Elec. Co.*, 986 F.2d 1415 (Table), *4 (4th Cir. 1993) (unpublished) (stating that "deviation from established procedures creates no presumption of discrimination, especially when there is little other evidence supporting a finding of discrimination"). After reviewing the state of the evidence regarding MAU's knowledge of and reliance upon the certified positive test result, the Magistrate Judge concluded that "nothing in the record supports a finding that the decision to terminate Plaintiff was made for any reason other than a violation of MAU's Alcohol and Substance Abuse Policy." (*See* ECF No. 42 at 12-14.) Finally, the Magistrate Judge found that Plaintiff had not satisfied his burden of demonstrating a

triable issue on the question of pretext, *see Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 217 (4th Cir. 2016) (holding that a plaintiff must demonstrate a "genuine dispute of material fact on the question of pretext sufficient to make [the employer's] proffered justification a triable issue"), "because the record does not support a finding that MAU's proffered reason for terminating Plaintiff is false." (ECF No. 42 at 14); *see also King v. Rumsfeld*, 328 F.3d 145, 154 (4th Cir. 2003) (Gregory, J., dissenting) ("To survive summary judgment . . . [a plaintiff] need not squarely rebut his employer's explanation. Instead, [he] must cast sufficient doubt upon the genuineness of the explanation to warrant a jury's consideration of possible alternative and discriminatory motivations for the firing.").

In his objections, Plaintiff attempts to pick apart certain statements in the Report (*see* ECF No. 44 at 12-17), ostensibly with the goal of showing that if MAU knew Brannon failed to make contact with Gray during the prescription validation process, then a genuine issue of material fact must remain regarding the pretextual nature of the termination decision. But the conclusion of this conditional statement is a non sequitur. While not stated in these precise terms, Plaintiff's combined arguments essentially posit the following alternative scenarios as being mutually exclusive and jointly exhaustive outcomes of the drug testing policy when communication with the employee in the course of seeking prescription information is unsuccessful: MAU either (1) acts in a non-discriminatory fashion by exhausting all possible efforts, both through its MRO and its own representatives, to contact the employee, or (2) acts in a discriminatory fashion when it "blindly" relies on a certified positive result after either the MRO or MAU's own

representatives fail to make contact with the employee. This dichotomy is a red herring, constitutes too narrow a view of the factual contingencies involved in a termination scenario like Gray's, and ascribes discriminatory motive by default to conduct that is otherwise benign. It can be true *both* (1) that MAU knew Gray had not been successfully contacted during the course of the prescription confirmation process (for instance, by reading Brannon's form documenting her attempts to contact Gray), *and* (2) that Gray was fired based on MAU's non-discriminatory belief that the substance abuse policy had been violated.

One obvious inference that MAU might draw from the fact that the MRO failed to make contact with Gray, is that Gray did not respond to Bannon's communications because he had no valid prescription to produce. This inference could be simultaneously incorrect and innocent of discriminatory intent. More to the point, in the absence of *any* evidence to show that Gray's termination grew out of some alternate reason, there is nothing but speculation to support Plaintiff's assertion that MAU's reliance upon the certified positive drug test was pretextual. Nothing in the record suggests that the termination decision was based on Plaintiff's ADD, which, by his own testimony, was unknown to MAU until he disclosed it to Rice during the termination meeting. (Gray Dep. 74:1-75:7, ECF No. 35-2.)

Said another way, there is no evidence that MAU's reliance on the findings of the MRO was not in good faith. Viewed in the light most favorable to Plaintiff, the facts dictate that MAU knew the steps generally taken by the MRO in certifying positive drug screens, and knew that Brannon had been unable to contact Gray during the certification

process. They do not, however, dictate that MAU's reliance on the MRO's positive certification sprung from a nefarious motive, nor do they dictate that the lack of *additional* efforts by MAU to obtain Gray's prescription constitutes an actionable lack of due diligence. There are all kinds of reasons why an employee might choose not to respond to inquiries from a lab requesting prescription information related to a positive drug test, and there is no authority for the proposition that MAU was *required* to independently inquire into the potential reasons why Gray did not respond. The ADA does not impose an affirmative duty on employers to seek out the existence of potential disabilities that their employees have not otherwise disclosed, and the Court will not read such a duty into the statute. The scientific validity of Gray's test result—i.e. the presence of amphetamines in his urine—has never been in dispute, and Gray did not provide a copy of his prescription when the MRO initially sought it (albeit, he asserts, because he was unaware of Bannon's repeated attempts to reach him). As MAU artfully states in its reply to Plaintiff's objections, "Absent some evidence that MAU knew its MRO was not complying with the law in its administration and analysis of post-accident drug screens, MAU had no obligation to question the MRO's findings." (ECF No. 48 at 5.) Accordingly, the Court overrules Plaintiff's objections in this regard.

Finally, Plaintiff objects that the Magistrate Judge "weighed the evidence" and made a "credibility determination" when she "chose to believe the testimony of MAU's witness Dwayne Oakley in contravention of [summary judgment] standards." (ECF No. 44 at 16-17.) Plaintiff specifically takes issue with the following language from the Report: "[A] review of [the email exchange between MAU supervisors on February 11,

2013] establishes that Oakley believed that, before the MRO certified the positive results, Plaintiff had been afforded the opportunity to produce a prescription." (*See* ECF No. 42 at 13 n.10.) Plaintiff argues that this conclusion amounts to an inference impermissibly drawn in MAU's favor, and that the Magistrate Judge erred by unduly ascribing superior credibility to Oakley's testimony regarding MAU's lack of involvement in the prescription verification process over conflicting testimony from Devore and Rice that they sometimes obtained the relevant documentation from employees directly. The Court disagrees with these arguments and overrules the objection.

The Magistrate Judge's observation about Oakley's statement in the February 11, 2013 email exchange does not turn on a credibility determination. The language with which Plaintiff takes issue is an excerpt from a footnote to the following sentence in the Report: "Moreover, Oakley indicated to others that the MRO would have contacted Plaintiff to discuss medications before signing off on the results." (*Id.* at 13.) The Court finds that this section of the Report accurately summarizes the import of the relevant communications between Oakley, Devore, and Rice in the email exchange. There is no evidence to support the notion that Oakley's statement represented anything other than his understanding of the procedure by which the MRO typically dealt with positive drug test results. To read more into the statement is to engage in pure speculation.[6]

Furthermore, to the extent there is any real conflict between Oakley's testimony about MAU's involvement in the prescription verification process, and Devore and Rice's testimony on that same subject, such conflict does not constitute a material issue and

_____

[6] Plaintiff presumably engages in such speculation in an attempt to manufacture a dispute of material fact: "[A] reasonable juror might well conclude that Oakley wanted Gray to be fired and was actively attempting to keep his more conscientious colleagues from doing what they regularly did in other cases – reaching out to the employee to make sure he knew he needed to bring in his prescription." (ECF No. 44 at 17.)

will not prevent the granting of summary judgment. In response to the question—"Does MAU get involved in efforts to *contact the employee to let the employee know that he or she needs to communicate with the MRO about a result*?"—Oakley responded: "No. And, there again, we don't know about the results or any medication until the MRO has signed off, and that's really protection from a HIPAA standpoint that *we're not getting involved in that communication between the two*, so we've never been asked to do that." (Oakley Dep. 22:19-23:3, ECF No. 35-27 (emphasis added).) In response to questions about whether they would sometimes be the ones to reach out to an employee for prescription information Devore and Rice both indicated in the affirmative.[7] (*See* Devore Dep. 15:22-16:10, 17:21-18:1, ECF No. 36-12; Rice Dep. 21:12-22:1, ECF No. 36-4.) Whether Oakley was answering a different question than Devore and Rice, or whether he simply had a different understanding of MAU's involvement in the prescription verification process than his colleagues,[8] there is no evidence of a discriminatory motive behind his testimony. Likewise, there is no evidence that his comment in the email exchange was intended to prevent Devore and/or Rice from obtaining Gray's prescription. While it is true that all reasonable inferences must be drawn from the underlying facts in the light most favorable to the party opposing summary judgment, *see Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir. 1992), *cert. denied*, 507 U.S. 918 (1993), "'[p]ermissible inferences must still be within the range of reasonable probability .

---

[7] When asked whether the initial onsite drug test after Gray's workplace accident was negative or positive, Rice incorrectly responded, "It would have been positive." (Rice Dep. 22:2-4, ECF No. 36-4.) As already discussed (*supra* at 13), the Court cannot help but observe that a negative onsite test would likely affect Devore and Rice's motivation to seek prescription information from Gray. In other words, they may very well have had no reason to know that prescription information was required until the certified positive result was forwarded by the MRO to MAU.

[8] At all times relevant to the case, Dwayne Oakley was MAU's Site Manager at BMW Manufacturing Co.; Jody Devore was MAU's Human Resources Manager; Ronnie Rice was an Associate Relations Leader for MAU.

. . and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture.'" *Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995) (quoting *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir.), *cert. denied*, 358 U.S. 908 (1958)). The inferences that Plaintiff asks the Court to draw amount to speculation and conjecture, and the Court declines to do so. Accordingly, Plaintiff's objections are all overruled.

## CONCLUSION

After careful consideration of the relevant motions, responses, and objections, the Court adopts the Report and Recommendation. It is, therefore, ORDERED that BMW's motion for summary judgment (ECF No. 34) is GRANTED, and MAU's motion for summary judgment (ECF No. 35) is GRANTED with respect to the discrimination and retaliation claims and DENIED with respect to the failure to accommodate claim.

**IT IS SO ORDERED.**

/s/Bruce Howe Hendricks
United States District Judge

August 16, 2017
Greenville, South Carolina